for the delay. This is case number 4180804. In re Marriage of Terrence Kochis. Is that a correct pronunciation? Okay. And Lisa Beasley. For the appellant we have Dustin Jensen. And for the appellee, Aaron Galloway. Correct? Okay. Mr. Jensen, you may proceed. Please report, counsel. My name is Dustin Jensen. I'm a partner in the test for example for Georgia Illinois. I represent a respondent and appellant, Lisa Beasley. This appeal raises the issue of whether the trial court properly ordered distribution pursuant to a marital settlement agreement. Of a distribution of petitioner's pension funds pursuant to a marital settlement agreement that was drafted by a petitioner's attorney when a respondent was unrepresented. This court addressed this issue in in re Marriage of Kolk, or addressed the issue of the distribution of pension benefits when parties had a divorce. I'd like to quote from Kolk because I think that it's important to take this position in this case. Courts employ two different methods in distributing pension benefits. First, the present value or immediate offset approach. And second, the reserved jurisdiction approach. When using the immediate offset approach, the trial court determines the present value of the pension plan, awards the entire pension to the employed party, and awards the other party enough other marital property to offset the pension award. Pursuant to the reserved jurisdiction approach, the trial court reserves jurisdiction to divide the pension if, as, and when. Counselor, are you arguing that the parties cannot agree to take an approach other than the present value or reserved jurisdiction approach? I would assume that the parties can agree to anything that they both accept as reasonable. I suppose, hypothetically, yes. Parties without children can agree to any distribution that they see fit. However, I think that, and our brief touches on, this case is nearly identical to Kolk. I don't understand how, because in the very first paragraph of Kolk, it identifies the language of the settlement agreement, which is completely dissimilar to the language in this settlement agreement. It says that the retirement benefits were to be, quote, equally divided, close quote. Here we have some specific that's identified in the agreement. So how do we equate Kolk with this case? I would agree that that is the only distinguishing factor. I'm jumping away ahead in my outline here, but I would agree that that is the only distinguishing factor in this case. However, if you look at, despite the different verbiage that's used, these settlement agreements are saying the same thing. In Kolk, the settlement agreement says there's a pension. It's presently worth approximately $4,000. The spouse gets half of that when it's paid out. In this case, the marital settlement agreement says that the respondent is entitled to $10,045.25, and I stress, of the pension benefits with TRS, which have accrued during the party's marriage. So sure enough, $10,045.25 is half of the pension benefits that had accrued during the party's marriage. Why didn't they just say half then? That's a good question. One potential explanation for this that we address in our brief is that the petitioner was represented. The petitioner's attorney wrote this marital settlement agreement. The respondent was unrepresented. Given that maybe this was some sloppy drafting on the petitioner's attorney's part, the fact remains that they agreed to split the pension benefits, and the split that they agreed to gives my client half of the marital portion of the pension benefits. To the extent that, I mean, if this court is going to find that the phrase $10,045.25 of the pension benefits of TRS, which have accrued during the party's marriage, if it's going to find that that is not making an attempt to split the pension benefits, then so be it. I have a tough road to hoe in that case. However, at the very least, I think that the fact that it does include this phrase that this money is part of the pension benefits, which have accrued, at the very least makes it ambiguous. That's the crux of your argument, as I understand it here. The inclusion of the phrase of the pension benefits. To you, that communicates the party's intent, or arguably the party's intent, that this sum specific simply represents a fraction of the earned pension benefits at that time? Correct. And if you look at the TRS information, which is part of the record, it's not just the sum specific. It is half of the pension benefits. I understand that ultimately that's how it plays out in terms of the calculation. But the parties, to a penny, identified the amount of the pension benefits to go to your client. But you're saying that they didn't intend that it be a sum specific. They intended it to just simply communicate a fractional share. Right. And I think that's what it does. If you look at 10,045 as the numerator, and the amount of pension benefits which have been accrued during the marriage as the denominator, when you put that together, it is one half. It's always going to be one half, isn't it? It's always going to be one half, isn't it? In most cases, sure. But I think that is where Culp, because we're focusing on this verbiage of Culp, which, as I said, I think is potentially the only distinguishable fact in this case. And even though it is distinguishable, as I said, I think unless this court is going to say there was no attempt to split the pension benefits here, that that fact just makes this ambiguous. And if it's ambiguous, it must be strictly construed against the person who is represented and whose attorney drafted the marital settlement agreement. And I've laid forth in our brief how you can – I don't even think it has to be a strict construction. I think that's the way to construe this, is that they are trying to split these pension benefits. That 10,045 just shows that's half. And, yeah, you know, I think the Culp attorney did a much better job of expressing that intent, but you're still making the same intent. But that's just one factor that this court in Culp relied upon in making its ruling. It looked at two other factors to say, yeah, this marital settlement agreement was using the reserve jurisdiction approach. It was trying to split these benefits if, as, and when they were approved. And that was, one, the court pointed out that this marital settlement agreement calls for a quill drift. If it's calling for a quill drift, that implies that it intends to retain jurisdiction and split these benefits if, as, and when they become payable. Well, in this case, the marital settlement agreement, I don't think it's disputed, calls for a quill drift. All right. Well, I think that's the third factor that Culp kind of addresses, is that if this was truly intended to be a lump sum payment of $10,045, forget the pension, and you get $10,045 regardless of what happens to the pension, there is no incentive for the respondent, in this case, my client, to delay that payment until the payment has become due. And the court focuses on this. How do I know there was no incentive? Well, because... Could have been in some other part of the marital agreement. I mean, we don't get into the rest of the marital agreement, at least as far as I can tell as far as argument, but maybe there was incentive for her to forego monthly payments at some point in the future when he retired. I don't know. You say there isn't, but... There's been no indication that there... In my review of the marital settlement agreement, I've not seen any indication that, you know, a respondent is getting X to forego an immediate payment or a splitting of the pension benefits, and opposing counsel has not raised one to my knowledge. And so I don't think that that holds in this case. But what it is is that I think the cold court kind of laid this out pretty nicely to say, look, if you're going to forego the risk and benefit of the pension benefit as it accumulates more value, there's no incentive to wait to get that until 20 years down the line. That's what we're talking about. Unless... It's worse after October 1998. I'm sorry? Unless the money's unavailable. Well, unless the money's unavailable, but at that point, I think that parties find liquidity all the time to make these things work. And if the money's unavailable, then why would a respondent agree to forego... I mean, if the true issue is we don't have $10,000 split right now, so you can't have any of the pension, why would you agree not to take any of the pension? I mean, if you're not going to take any of the pension, the tradeoff is you get the money in hand right now. As the appellant, whose burden is it to persuade us that there was some reason to not delay it at that point? I mean, you're asking us why would your client agree to delay it. I mean, can you tell us, is there anything in the record? I mean, I'm looking at the trial court's order that was dated September 21st of 2018, and it says on the evidence before the court, it would appear that the intent of the parties was to provide wife with $10,045.25 of pension benefits accrued to husband to be paid at a time not then known or reasonably anticipated. So it doesn't seem like the trial court was provided with any particular reason why it was being delayed. But, I mean, what are we to do with that? How are we to say that that finding was error? Well, because I think, again, you're probably tired of me referring to Colt, but I think Colt addresses this. I mean, in Colt, the court just says, look, there's no reason to delay this payment. There's no, in the court opinion, there's no reference about, you know, there was this evidence regarding why they wanted the payment up front or down the road. The court just said, look, this is unreasonable to say I'm going to take a lump sum, but I'm not getting it until 10, 15, in this case, 20 years down the line. And so the court didn't even look to evidence in that matter. It just made that finding that if someone's taking a lump sum, they're not going to take it 10 years down the line. That doesn't support immediate offset approach finding. Yeah, therefore, that lack of finding or information explaining why the lump sum wasn't taken lends well to your argument. I think so, Your Honor, yes. I mean, without something that, kind of we talked about this earlier, without something that says, look, clients taking 10, 45, but not until 20 years down the line, without something explaining why that's happening, I think that the logical conclusion is that that wasn't the intent. And again, I go back to Carballo. Even if this court disagrees with my position on that, I think at the very least we can say that the fact that this says it's part of the pension benefits makes it ambiguous as to what the parties were trying to do. And in that case, the fact that Petitioner was represented, Petitioner's attorney drafted the marital settlement agreement, this must be strictly construed against them. And so I have made my hand on coal. I think Justice Harris correctly pointed out the one distinguishing factor, the fact that the language was a little more artfully crafted in coal. However, I think when you look at it, this marital settlement agreement says the same thing. It says you're entitled to a portion of the pension benefits. And when you plug in the pension benefits that were approved, it says the exact portion that was given in coal. And the remaining two factors that the court thinks it's had on coal are absolutely pressing here. There's a quill drug requirement, and there's just no explanation why the respondent would agree to wait 20 years for a lump sum payment. Let's talk about that quill drug. Who drafted that order? My understanding is that it was the Petitioner's attorney who also drafted that order. Not my client. Did your client see the order before the court entered it? I do not have that off the top of my head. Well, isn't that important? I don't know that it is because— Well, how does one party enter an order without the other party, especially since this was almost a year later, having seen it and approved of it or at least had an opportunity to have input as to what that quill drug was going to say? Your Honor, I apologize. I'm not quite sure the exact events that happened 20 years ago when this was entered, but the reason why I apologetically am not prepared to kind of jump into that issue is because what we've pointed out in our initial motion that got this thing going is that there's no limit on a court's jurisdiction to amend a quill drug. Well, the quill drug is for your client's benefit, not for Petitioner's benefit. Would you agree with that? Because that's the protection afforded to your client pursuant to the quill drug as to TRS and the preservation of those funds, those pension funds, correct? I agree with that. So it seems like to me the burden should be on your client to make sure that the quill drug that was entered was the correct order. And apparently it was not. What say you to that? Even if we're hitting our head on this quill drug and allowing that may raise issue for my client, I still think that Petitioner has an issue because that quill drug only allowed for one scenario where my client got a payout, and that was a lump sum distribution to Respondent. Right. It also says that Respondent cannot elect a payment that would prevent my client from getting their lump sum payment. And there is a provision in the quill drug, apparently it's the first alternative under paragraph 3 that allows for a reserve jurisdiction type of portion of the work, right? Well, how should that be filled out then? Of the members' retirement benefit, blank dollars per month beginning blank. What was supposed to be put in there? Sorry, I don't have the quill drug in front of me, but I think that our brief sets out what the proper distribution would have been. It would have been one half of the marital portion of those benefits once they start to get paid. And as per the HUNT formula, again, if there's no statement on any formula to use to distribute these pension benefits, HUNT is used. And I don't think it's that controversial to say that, look, if we agree that this marital settlement agreement split the pension benefits, which however sloppily it may have done that, I don't think you can argue that it does not split the pension benefits. The quill drug wasn't entered at the time of the judgment of dissolution, right? Correct. Was it a year later? Around that time. Okay. Was your client represented at that point? My understanding is she was not. Okay. So again, we come back to, I guess my whole take on the quill drug is that if the quill drug is inconsistent with the judgment of dissolution, it can be amended. Yeah. We've cited that in the trial court. I don't think it was a big issue in the briefing in front of this court, but it's in the record that I don't think that is that controversial to say. Well, if it can be amended, it can also be vacated, and that's what the trial court did, right? Correct. But the problem with that is, in our argument, is that while you can vacate a quill drug, you can't change a marital settlement agreement or a judgment of dissolution. And so you can change a quill drug or vacate a quill drug to make it consistent with your marital settlement agreement or judgment of dissolution. It's our opinion that by vacating that quill drug and allowing a petitioner to make a payment to a respondent from funds outside of the pension benefits, you've not complied with the marital settlement agreement which was incorporated in the judgment of dissolution. There's where you have a problem. There would have been no problem to change that quill drug to say we're going to make this quill drug consistent with the marital settlement agreement which requires for a splitting of the pension benefits. But based on the respondent or, excuse me, based on a petitioner electing to receive pension benefits on a monthly basis, how would your client then receive that $10,000 through a quill drug? Well, I think that what we are stating is that that quill drug, I'm sorry, not the quill drug, the marital settlement agreement did provide for our client to get a portion of that monthly benefit by employing the Hunt formula. And you can employ that Hunt formula by taking the $10,045, using that as a numerator, and the amounts of the pension benefits that were accrued as a number. The trial court disagreed that there was an ambiguity, looked at the $10,045.25 figure as a sum specific that the parties agreed to. Under the quill drug, the terms that the petitioner had elected to receive pension benefits, it doesn't seem like the trial court could do anything but vacate the quill drug. It couldn't enter another quill drug that would have satisfied your client's right to the $10,045.25. Maybe under the trial court's specific finding that you referenced, but I would point out that this court has a de novo review because this is a contractual interpretation question. And as I pointed out, I think that in any universe, these parties try to split the pension benefits. Okay, and that takes you back to the ambiguity. Correct. And I would argue it's not even ambiguous. I would argue that the way this contract reads, $10,045.25 is half of the marital portion of the pension benefits. You look at all the other factors referenced in Cole, this should be a reserved jurisdiction for us to switch it if, as, and when. One final question from me. How, if it was the party's intention at the time that the marital settlement agreement had been entered into, if it was the party's intention, intentions to identify a sum specific relative to petitioner's pension benefits that respondent would be entitled to, how would it have been worded in that marital settlement agreement other than how it actually was in this case? Well, I think you identified this at the beginning of the argument in Cole. They could have said there's this much in the, that have accrued, respondent is entitled to half. And that's what I say. The verbiage used isn't perfect, but I think that goes back to, at the very least, the fact that they're splitting pension benefits. If you, if your predisposition is that this is ambiguous or that it's not clear that they were trying to split the pension benefits, the fact that there is that language splitting pension benefits at least makes it an ambiguous question. And that's where I think Carballo comes in. You look at who was represented, who wasn't, who drafted that order, and that's how we get to the same result, that there is a construction of this language that allows for the reserved jurisdiction and approach for my client to receive a portion of the monthly pension benefits. Thank you. Thank you, Your Honor. You'll have rebuttal. Mr. Galloway. Thank you. I'll begin with the cult discussion it does. That's where we left off. And the issue of the ambiguity, if we're going to look at the parole evidence to determine the intent of the parties in 1998, we should look at all of them. And that also includes the verified petition filed by her attorneys in which they allege that her portion was $10,045.23 and that this was an unfair deal. That's her statement. That's her interpretation of the agreement. Second, you can look at the domain letter that was part of the affidavit which was sent by the respondent, her attorney, in which they prepared a quill drill that allowed for monthly payments up to $10,045.23 and asked him to enter that. That's their interpretation. You say if we determine it's ambiguous, we should look at all of the parole evidence. Is it ambiguous? No. Why not? It is $10,045.23. Mr. Jensen says that the language of the pension benefits denotes that they're actually communicating a fractional share as opposed to some specific. So what do you say to that? Well, cold. That discussion is about what equal means. That was the ambiguity of cold. So if you look at cold, and they talk about the approximation, it's approximately $84,000. It talks about the marital portion. It talks about the date through the entry of the judgment of dissolution of marriage. That is a fractional share. Here, there's nothing that says of the marital portion. He brings in the parole evidence to say, look, $10,045.23 happens to be one half, but that's not in the marital settlement agreement. So if you're looking specifically at the language in that marital settlement agreement, there is no conclusion that you can come to that says, or there's no words that you can come to that says this is fractional, this is a portion of the marital, and we know how to figure it out. It's not in there. Well, isn't it pretty obvious that they took half of the marital that accrued? Because they got that information from TRS, right? That is how they calculated the number. I mean, the only reasonable inference is that it's half of that amount, right? That that is the amount they agreed on, yes. It is not a reasonable inference that now the court can allocate that later and make a determination later. That's a difference. That's a jump there that's not in cold. So that's the distinction with cold. He talks about the equal division. If you're going to look at the contract, you should look at the words on the contract. If we're going to go beyond that, let's go beyond that and look at the words of the respondent and what her interpretation was when she demanded the $10,045.23 in 2017 represented by counsel. We can look at the verified petition that she signed in 2018 where they allege that this is unfair because she only gets $10,045. What was the response to that demand? Well, the response to that demand, it wouldn't be on the scope of the record. Wait a minute. So the demand is part of the record, but the response to the demand is not part of the record. Is that what you're saying? I am saying there is an affidavit, yes, and there is an affidavit that's filed on C87 that was the affidavit filed by the petitioner. Counsel, I don't know that you can refer to lawyer communications in 2017 as parole evidence of the party's intentions at the time the settlement agreement was created. Parole evidence allows, if there's an ambiguity in the agreement, allows parties to bring in evidence of what else was going on at the time that the agreement was entered into, right? Not what happened years later in a lawyer's interpretation, perhaps, of what that agreement says. How is that parole evidence of the party's intentions at the time that the agreement was created? There's that in the verified pleading that she signed, which is her statement, and that is indicative of her mindset. Is that an admission? Yes, it's an evidentiary admission, Your Honor. Okay. But not only that, but it's still indicative of what her mindset is. If she believed this entire time, for 20 years, that it was reserved, why did she write the letter in 2017 and authorize her attorney to send that letter saying, give me $10,045? Because she and the attorney are dealing with the facts before them available at that time. There's been rulings, and they have to accept those rulings and advocate their best position at that time. There have been no rulings at that time. That was before anything was filed. That's still indicative of her mindset. If she truly believed it was reserved... So this is before, this is the settlement agreement discussions? This was not a settlement agreement discussion. She wrote a demand to the respondent to sign the quildra that she had prepared, which allowed for monthly payments up to the amount of $10,045.23. She did say, I hope we can resolve this amicably, that that's not a compromise. The rules of evidence talk about compromise, and that's when you give something up that you think you're entitled to, and you give something back in return. Her letter says, I'm entitled to this. Please sign the order so we can settle this amicably. But she didn't give anything up that she believed that she was entitled to. In fact, she said the agreed amount, it's in that letter, the agreed amount was $10,045.23. So if you look at the rules of evidence and it talks about offers and compromise, that's if there's a differing opinion on the amount. There was no differing opinion on the amount at that time, and there's no evidence in the record that they ever disagreed until we get to the point where they file a petition to vacate the original judgment. That was withdrawn, but it's still an evidentiary admission that the court can properly consider, and then files the motion to enforce it. I want to ask you the same thing I asked the opposing counsel. Did respondent see the qualified Illinois domestic relations order before it was entered? She did and she signed it. It's on C-99 of the record. C-99? C-99. Okay, so I don't have that in front of me, but that C-99 shows that she approved of the quill drill. I'm talking about the one that was entered in 1999. I do have a copy. Okay, very well. I can look in the record, thank you. So she approved it, and obviously your client approved it because paragraph 5 says that your client has to approve it, correct? Okay, so they both approved of her getting $10,045.25 from his refund payable upon termination or lump sum retirement benefit, right? Correct. Okay. Your client didn't take a lump sum retirement benefit, so your client did not comply with the quill drill, correct? That's correct. Your client instead, probably because he did the math and said, wow, I don't want a lump sum payment. I want monthly benefits. So he didn't follow the quill drill. He chose monthly benefits, so the question becomes as a matter of equity, why can't she do the same thing? Because your client is the one that didn't follow the quill drill that was entered. Because the difference to her, it's the same thing. Whatever he does does not impact her, provided she gets the $10,045.23. Also, the quill drill would be, one, security if he was to take the money. Number two, the quill drill could always be modified to conform to the intent of the parties of the marital settlement agreement. And that was in the language I cited, I'm sorry, the cases that I cited in my brief talk about that, the court always retains the jurisdiction to modify those quill drills or quadras to conform to the marital settlement agreement. But the deal that was made, what we don't have in the record is who got what bank accounts, who got what vehicles, what debts were assumed by who, what was the interest rate on those debts. Okay. Paragraph four says, so long as this quill drill is in effect, the member may not elect a form of payment of the retirement benefit that has the effect of diminishing the amount of the payment to which the alternate payee is entitled. That is precisely what your client did. In fact, by electing monthly benefits, that completely took her out of the quill drill and so she got nothing from it. Is that correct? I don't know. I don't know what happened. That's why the trial court vacated it, isn't it? Well, I'm not sure that the trial court specifically dealt with vacating the order up through October 26, 2018. I know the trial court was addressing what happens with the party's intent. I can't recall. I'm sorry. It might be in the order, but the trial court did point that out. But for her, she still has the enforcement, which is she got what she asked for. The trial court entered her judgment, $10,045.23, and the trial court found that interest was payable back to the time that he made the election in 2000. I think it was 2016 or 2017. How about counsel's argument there was no incentive for her to agree to the $10,025 unless she was going to get it at the time of the dissolution, which then would seem to me to suggest she should get interest from that time. Well, the problem with that is the marital settlement agreement, and this is an allness in my discussion on the interest. The interest begins when the judgment becomes collectible. The trial court properly determined that the parties did not agree on a date that's payable, so that judgment was not collectible until October 26, 2018. The trial court under Finley does have discretion to go back prior to the day of judgment, and I think my interpretation is a little bit different than the trial court's. It said it was collectible back when he made the election, but I think the part that fits, if you look at all the case law, what makes the most sense is it was collectible October 26, 2018, and you go backwards looking at Finley as far as the prejudgment interest and equitably award the interest back to the time that he made the election, and that does fit the law. So I believe the trial court was correct, even if we get there in a different way. Part of the challenge, though, is also knowing exactly what assets the parties had at the time and who assumed what debts, and so the burden is on the appellant here to bring this record before the court to persuade the court that the trial court failed, and there's no evidence that was taken as to what the parties walked away with, so when we sit back here and we look at just one small part of the picture and say that this small part is unfair, we're forgetting about the rest of the puzzle and how all the pieces fit, and that's the problem with this approach of just taking one paragraph saying it's unfair, I don't like the way it played out, now we want to undo it, and that's essentially what... that is what they've done, and that's what they've admitted is the purpose. It's in her verified plea. How should we apply cult if at all, that portion of cult that discusses the inequity that would result to the... in that case, the... the respondent... if... the court did not... let me get to that portion of the decision... did not allow her to realize some of the increases in the value of the pension, just as the circumstances would be here, or are here, as opposed to defining her benefit at the date the marital settlement agreement was entered into. I worded that in artfully because I was trying to read at the same time, but cult recognized an inequity under these circumstances, it seems, where there was no, in that case, identifiable reason why she would have agreed to postpone her share of the pension until a later date, and thus... awarded her a portion of the increase in value after the date of the dissolution. The cult court was interpreting the language that said retirement benefits shall be equally divided as of April 20th, 1999. Both parties come in and disagree on what exactly that means. He says that means you get no cost of living, you get no interest, and you get half of that amount, you get half of the $84,000. The cult marital settlement agreement did not say those things. It said equally divided as of April 20th, 1999. If the cult doesn't stand for this broad proposition that we're going to look back at the deals that people made 20 years ago and try to figure out if it's fair or not, it says, look, if they agreed to equally divide an asset that we don't know the value of, and it's not determined in the marital settlement agreement, then, no, we're not going to take your interpretation that it's half of that. He did not have that language in the agreement. The husband did not. So that's the difference in cult, and that's why I think it's important that in cult to understand that they're interpreting equally divided. This is not a broad application of the law and doesn't stand for the proposition that we go and re-evaluate all the marital settlement agreements. So the key language in cult is equally divided, which we don't have here? That's your argument? I want to make sure I understand. Yes, it's that in conjunction with the absence of a specific song which cult references on the husband's, the 5K, 547 of that case. Is it also relevant, or let me rephrase that. Is it relevant here that in cult there also was not a quildro entered? And in this case, there was a quildro entered albeit a year later, but that identified as some specific... Yes, it is because in cult you can infer from your intentions quildro can enter later that it would be a division. Here it was entered a year later, and there was a place for a formula, and that was not shown. I don't think this probably matters, but just out of curiosity, why did the order say that the quildro was to be entered in July? What was the point of saying it was supposed to be done in July? Of course, it wasn't done until October. Or do you know? I'm not sure. I think looking at my points at the data on page 387, I think there was a discussion or a question about whether he would be able to continue to work. I don't know what the reasons were. I think there was some discussion at that time about that. I'm not sure if that's in the record or the data. Counsel has argued that the fraction, I think was, if I recall right, nine, because there were nine years, divided by 33 years, which was the number of years that your client had in TRS. Does that sound right? I'm not sure. I'm sorry. I was just noticing that the information from TRS says that there were 35 years of service credit, not 33. Mr. Ebal, I suppose, would counsel that. The last issue, just hold on. The last issue that I had raised in my brief was that of the jurisdiction. I covered that in my brief. There was also, he cites the Schumacher case that argues that a party cannot complain about jurisdiction when they induce the other party into missing the deadline. What's important in that case is that the defendant, the one that was wrong in that case, did not know the filing date because the other attorney, the plaintiff's attorney, appeared ex parte in front of the court, had a written order entered. Non-Pro Trump did not tell the other attorney that. It was not referenced in the court record. Only changed the copy that he had. He sent it to the opposing counsel. That's not what happened here. In this particular case, they entered the order after the fact. I did prepare a draft order. There was an issue with the prior filter that I just wanted to clean up. This is in my affidavit. And make sure that, for whatever reason, if something happened, that wouldn't still be there. When we walked out of the courtroom that day, if you read the transcript of what the judge says, you read the docket entry. Judgment entered. There is no question in anyone's mind that that was the ruling that resolved all pending issues. I did look ahead, thinking, maybe I should just get an agreement. Let's do this and get the filter off. After the response I got, I did not feel comfortable communicating anymore, and I stopped communication. There was nothing that I did that induced them into missing the 30-day deadline. Even if that order is entered December, that doesn't restart... I thought you asked them to approve your proposed order. I said, please look at this. Let me know if there are any edits. I sent the email. I never said I will submit the order. I never said that this is the order. I wanted to know because I had the language about the filters and the court didn't address it. And I loved it, in fact. So this isn't a case where they missed the 30-day deadline, they submit the order without asking me for approval, and then they filed a notice of appeal. And that court's docket entry didn't resolve the Pilgrim issue, did it? It did not, and no motion was pending on the Pilgrim issue. He ordered the amount paid. Okay, counsel, you are out of time. Thank you for your argument. Is there any rebuttal? Yes. Okay. I would just like to address some of the statements made by opposing counsel in his argument. Some of these are also covered in the brief, but I do think that they bear repeating given some of the representations made in court. First of all, this argument about a verified petition, the citation of that in his brief does not cite any verified petition. I'm unaware of any verified petition wherein there's some admission made that she was entitled to $10,045. So I just point that to the court. That is put in our brief. There's no citation of the record supporting that claim. With respect to the letter and the offer, we also addressed this. That was an offer in compromise. It shouldn't be admissible. When they raised that in the trial court, we raised a motion, or we filed a motion to strike. The trial court didn't rule on that motion because it felt it was premature, it needed more information, and it never ruled on that. And then that motion or that letter never got brought up again. And so regardless, it's clearly a compromise communication. Hey, give us this money. It was written by a prior attorney 20 years after the fact. And so even if you're saying, hey, I don't want to deal with this, what we are dealing with right now, give me the $10,000 and I'll go away, that has no bearing on what the parties intended 20 years prior. With respect to whether or not respondent approved the quildro, I will just go back to the fact that the quildro doesn't agree with the marital settlement agreement. It can be amended. And in this case, we've argued at length why the quildro doesn't agree with the marital settlement agreement. Is it significant that in Culp there was no quildro entered? And in this case, there was? I don't think so, Your Honor, because again, all the quildro does is protect the non-employee or the spouse for their portion of the pension benefits. The quildro has no ability to change the agreement between the parties. But you're saying that there was an ambiguity in the marital settlement agreement. The quildro here wasn't entered until a year later and still specified the same specific sum of $10,000, $45, and 25 cents. If it were in fact the intent of the parties to be a fractional share, you wouldn't have that same figure a year later, would you? Well, we're going to rely on that quildro as the true intent of the parties. And I think Justice Turner did a good job of pointing out, well, in that case, Petitioner didn't have a choice to take this monthly benefit. And he did. Under that quildro, he had to take a loan-sum payment every time, and he chose not to. And the quildro did not allow him to do that. Now, again, I think that that is an equitable argument that can be made, but I don't think he did that. I think under the terms of the marital settlement agreement, it's clear that they're trying to split these pension benefits. And under Colt, that's if, as, and when those pension benefits become payable. The one thing that I would like to talk about the interest, because if this court determines that, you know, the trial court was right, they didn't want to split the pension benefits, they just wanted to make this flat payment of $10,045, in that case, and again, according to Colt, if you're not splitting the pension benefits, that $10,045 becomes payable when they're divorced on October 27, 1998. Therefore, there's a judgment there, October 27, 1998, that $10,045 becomes payable on that date, and interest should accrue from that date. But the trial court data said, I'm not giving you anything from the pension benefits, but I'm giving you interest back to the date when the pension benefits became payable. Just doesn't, it doesn't make sense. Either she's entitled to something from the pension benefits, or she's not, and she was entitled to a flat payment of $10,045 when that judgment was entered, back in 1998. Finally, this discussion about, you know, we're looking at one sentence and we don't know what happened and everything else, the entire marital settlement agreement is part of the record, the C-15 through C-20, and as we talked in my initial argument, if this was really in lieu of some property division, that would be it. There's nothing in the marital settlement agreement that states that the parties think X, but because of lack of liquidity, they're going to give her $10,045 when the pension benefits become payable. It's clearly that she was entitled to a portion of the pension benefits, that portion was $10,045 over $20,090. And as we stated in our brief, she's in a home form where that's how you get to the property distribution. How much interest is involved at 9% over the last 18 years of the $10,025? We, and I apologize, we did actually put a brief in front of the trial court that calculated that. And it was, I believe, at the time of the argument, it was up around $27,000. At 9%? Correct. Not interest, that would have been the total, the principal for it plus the interest. Well, rule of 72, wouldn't it double every eight years at 9%? So that'd be 10, 20, at least 40, closer to $50,000. It's in the record. I don't know the figure off the top of my head. Okay, my last question, because you're out of time. I had to ask you, if we did go along with your argument, you had 33 years of service credit, but it looks like to me it was 35 years. What's your response to that question? My recollection from that TRS printout is that it says that actual service time, 33, and then you got two extra accredited years for whatever reason. It says years of regular service credit, 33, total years of service credit, 35, because they add on two years of permissive service credit. So under your theory, should it be 33 or 35? Well, we clearly put 33 in the clear. You clearly did. Is that wrong or right? I mean, I think it is right. You're looking at how much you work 33. This is 9 over 33. If it gets that extra permissive credit, okay. Frankly, if this court determines that it should be 9 over 35 instead of 9 over 33, I don't think we're going to complain too much about it. Okay, thanks to both of you. Thank you. The case is submitted. The court stands in recess until after lunch.